HERMAN SNITTJER, Appellant, v. JOHN PATERNI et al., Appellees.

CONTRACTS: Validity—Assent—Drunkenness—Effect. Drunkenness, in order to avoid a contract with reference to nonnecessaries, must be such as to render the party incapable of understanding the nature and effect of the agreement or its consequences.

*Appeal from Grundy District Court.*—GEO. W. DUNHAM, Judge.

NOVEMBER 26, 1917.

SUIT for specific performance resulted in the dismissal of the petition. The plaintiff appeals.—*Affirmed.*

*Williams & Clark,* for appellant.

*Williamson & Willoughby,* for appellees.

LADD, J.—The defendant, John Paterni, owned 90 acres of land near Wellsburg. About the second Monday of March, 1915, plaintiff, Snittjer, entered into an oral agreement to purchase said land at $235 per acre, paid $10 down, and later $10 for an oat bin, which otherwise was adjusted, and was to pay $1,000 on the next day, or when required by Paterni, and the remainder of the purchase price January 1, 1916. Snittjer tendered the remainder of the purchase price on that date and demanded a deed, but Paterni refused the money, and would not convey. The object of this suit is to compel the specific performance of this oral contract. It appears that, on June 12, 1915, Paterni entered into a written contract with John Tjaden, by the terms of which the latter paid $1,000 down, and promised to pay $1,000 on demand and $16,500 on March 1, 1916, and upon such payments Paterni undertook to convey the land to

Tjaden. Defendants contend that this contract was exe-
cuted by Paterni at the request of Snittjer, and in pursu-
ance of a bargain with Tjaden whereby the latter agreed to
take the land off Snittjer's hands at a profit to him of $500.
Snittjer contends that, though this may have happened,
he was incapable of making such request or of entering
into such a bargain at the time, owing to incapacity due
to intoxication; and this is the sole issue in the case.

About one o'clock in the afternoon of that day, Pa-
terni, with Peters, a brother-in-law of Snittjer's, went to
the latter's house, where he was in bed, but arose when
called by his wife. Upon coming out, he remarked that
he was not feeling very well. His wife testified that he had
become drunk in the morning, had gone to bed, and was
drunk when he arose to meet these men. Paterni offered
him $90 or $100 to let him have the land back. Snittjer
refused, and walked on toward a store some 20 steps
ahead, talking to himself or to Paterni, the latter being un-
able to say which. Later, Peters took him in his automo-
bile to the home of Tjaden, and there, after considerable
parley about the sale of the land, Tjaden accompanied them
to the Wellsburg Savings Bank, where negotiations con-
tinued, Tjaden offering an automobile for his bargain in the
land, and Snittjer insisting on the payment of $500. Fi-
nally Tjaden took the land on Snittjer's proposition and
Peters called Paterni, and the contract was entered into,
as previously stated. Tjaden paid Paterni $500 and exe-
cuted a check for $500 to the bank, and that amount was
entered on its books to the credit of Snittjer.

The evidence leaves no doubt that Snittjer had been
using intoxicating liquors to excess for 25 years, and for
2 or 3 months had been under the influence thereof most of
the time. But he had not been permanently incapacitated
for the transaction of business, and, to obviate the sale of
the land to Tjaden, it must appear that he was so excess-

ively intoxicated at the time as to have been utterly de-
prived of his reason and understanding.   Anciently, no in-
dulgence was extended to a person in such condition, Lord
Coke saying:

"As for a drunkard who is *voluntaris daemon*, he hath
(as has beene said) no privilege thereby, but what hurt or
evil soever he doth, his drunkenness doth aggravate it."

The rigor of this rule has been relaxed, and an agree-
ment for other than necessities made by a person when so
drunk as to be incapable of understanding its nature and
effect is voidable, at his option.   Such a contract may be
avoided when (1) the intoxication is brought about by the
opposite party, (2) fraudulent advantage is taken of it,
or (3) it is so complete as to deprive the party of his rea-
son and agreeing mind.  1 Elliott on Contracts, Section 440.

That plaintiff may have been somewhat exhilarated or
intoxicated, so that he did not give the matters involved
proper attention, or fully realize the situation, was insuffi-
cient, unless he was so drunk as to be incapable of under-
standing the nature and effect of the agreement, or its conse-
quences.   In other words, he must have been incapable of
assent, and deprived of the power to know what he was
doing.   *Willcox v. Jackson,* 51 Iowa 208; *Kuhlman v. Wie-
ben,* 129 Iowa 188; *Moetzel v. Koch,* 122 Iowa 196; *Drefahl
v. Security Sav. Bank,* 132 Iowa 563; *Sievertsen v. Paxton-
Eckman Chem. Co.,* 160 Iowa 662; 1 Elliott on Contracts,
Sections 440, 441, and cases collected in notes.   *Bottineau
Land & Loan Co. v. Hintze,* 150 Iowa 646, merely deter-
mines that the evidence was sufficient to carry the issue as
to intoxication to the jury.

Though Snittjer testified that Paterni did not want
the $1,000 to be paid until final settlement, the evidence
shows that the latter was pressing him therefor.   It was to
"straighten up" the deal that Paterni went to the house,
and, though saying that Snittjer was then drunk, he thought

him capable of doing business when the contract was entered into, saying that otherwise he would not have signed it.

Peters swore that plaintiff was drunk, but that, notwithstanding this, he took him to Tjaden's house to sell the land, explaining that he wanted him to make $500, and feared he would lose it if he waited until he came sober; and yet this witness relates a perfectly rational conversation between Snittjer and Tjaden, beginning at the latter's house and ending at the bank, when Snittjer said, striking a table, "Give me $500 and the land is yours;" and Tjaden accepted the proposition. Tjaden testified that, though plaintiff had been drinking, he was in a condition to transact business, and Claussen, who prepared the contract, swore that, though he may have had a drink or two, he was not drunk. Beibeshimer agreed with all the other witnesses that Snittjer's appearance was "tough," but thought him sober enough to do business. Ben Paterni and Meint Tjaden met him late in the afternoon, when he told them of having made $500 on the deal, and attributed his good looks to wearing a corduroy suit. George Gertis testified that said plaintiff was under the influence of liquor at the bank, but understood what he was doing. Daily related that Snittjer came into his barber shop, a few days later, and informed him that he "had made $500 off Tjaden." Eygabroad, an employe, corroborated Daily's story. Kelly saw him on the street that day, and thought he was not drunk.

On the other hand, plaintiff's wife swore that he was too drunk to transact business, both when he left the house, which she says was 2 or 3 o'clock in the afternoon, and when he returned, at about 5 o'clock P. M. Plaintiff testified to having no recollection whatever of the negotiations with Tjaden, or concerning the execution of the contract by Paterni and Tjaden. Scrogge swore that he drank in his presence shortly before going with Peters, and that "he was

drunk, good and plenty." Gertis saw him at the same time, and thought him so drunk that he did not know what he was doing. Gertrude Snittjer saw him when he went into the bank, and considered him drunk.

That plaintiff had been drinking in the forenoon of the day, and that he was somewhat under the influence of intoxicating liquors when the bargain was made and the contract between Paterni and Tjaden was entered into, we have no doubt. We are equally well convinced that he was not so intoxicated that he did not understand precisely what he was doing, and the consequences to follow. Paterni was pressing him for adjustment of the land deal, and he could not have proceeded more rationally than he did in undertaking to unload his burden at a profit. Nothing in his negotiations with Tjaden evidenced any defect in reasoning or understanding. On the contrary, he persistently rejected all proposals for a trade and insisted on cash for his bargain, which Tjaden finally acceded to. Possibly he might have reaped a larger profit on his $10 investment had Paterni not insisted on payment of the $1,000 promised, or he had taken more time to find a purchaser. It is enough that he agreed to the sale, and at the profit stated, when able to understand what he was doing and the effect thereof, though tolerably full of intoxicating beverages.

There was no error in denying specific performance, and the decree is—*Affirmed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.